**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 11-cv-01629-REB-CBS

THE TRUST DEPARTMENT OF FIRST NATIONAL BANK OF SANTA FE, COLORADO BRANCH, and
RICHARD QUANZ as CO-TRUSTEES and REPRESENTATIVES OF THE IRREVOCABLE TRUST OF STEPHEN MELENDY, and
STEPHEN MELENDY,

    Plaintiffs,

NATIONAL FIRE INSURANCE COMPANY OF HARTFORD,

    Intervenor Plaintiff,

v.

THE BURTON CORPORATION,

    Defendant.

**ORDER RE: DEFENDANT THE BURTON CORPORATION'S
MOTION FOR JUDGMENT AS A MATTER OF LAW**

**Blackburn, J.**

The matter before me is **Defendant The Burton Corporation's Motion for Judgment as a Matter of Law** [#173],[1] filed January 10, 2013. I grant the motion in part and deny it in part.

**I. JURISDICTION**

I have subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

---

[1] "[#173]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

## II.  STANDARD OF REVIEW

A renewed motion for judgment as a matter of law post-verdict is determined under the same standards that govern resolution of a post-evidentiary motion for judgment as a matter of law under Fed. R. Civ. P. 50(a).  **FED. R. CIV. P.** 50(b).  Rule 50(a), in turn, allows the court to grant judgment in favor of the moving party when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  **FED. R. CIV. P.** 50(a)(1).  The motion is limited to those grounds advanced in the prerequisite Rule 50(a) motion.  See **Marshall v. Columbia Lea Regional Hospital**, 474 F.3d 733, 738 (10th Cir. 2007).  However, the court's consideration is not limited to the evidence presented during plaintiffs' case-in-chief.  See **Williams v. Long Island Railroad Co.**, 196 F.3d 402, 407-08 (2nd Cir. 1999); **Pet Food Express Ltd. v. Royal Canin USA, Inc.**, 2011 WL 6140874 at *4-5 & n.2 (N.D. Cal Dec. 8, 2011); **Jacobs v. Pennsylvania Department of Corrections**, 2009 WL 3055324 at *2-4 (W.D. Pa. Sept. 21, 2009).

Motions under this rule "should be cautiously and sparingly granted."  **Lucas v. Dover Corp.**, 857 F.2d 1397, 1400 (10th Cir. 1988) (citations omitted).  "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe," **Reeves v. Sanderson Plumbing Products, Inc.**, 530 U.S. 133, 151, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000), and refrain from making credibility determinations, **McInerney v. United Air Lines, Inc.**, 463 Fed. Appx. 709, 714 (10th Cir. April 11, 2011). Judgment as a matter of

law is appropriate "only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion." ***Hinds v. General Motors Corp.***, 988 F.2d 1039, 1045 (10th Cir. 1993). Contrary to plaintiffs' arguments, however, I am not constrained to consider only issues that were presented to the jury for determination or otherwise limited by the jury instructions that were given. I must consider whether the evidence presented at trial was sufficient to support a jury verdict on the claims at issue herein under the appropriate legal standards. ***See McInerney***, 463 Fed. Appx. at 714.

### III. ANALYSIS

This matter was tried to a jury from August 13-16 and 20-23, 2012. Six claims were presented to the jury for determination: (1) strict products liability; (2) negligence; (3) negligent misrepresentation; (4) breach of the implied warranty of fitness for a particular purpose; (5) breach of the implied warranty of merchantability; and (6) violation of the Colorado Consumer Protection Act ("CCPA"). After six days of deliberation, the jury was unable to reach unanimous verdicts, and I therefore declared a mistrial. (***See* Courtroom Minutes** [#166], filed August 30, 2012.) This motion followed.

By this motion, defendant insists that plaintiffs failed to present sufficient evidence to demonstrate (1) that the RED Hi Fi II helmet which Mr. Melendy was wearing at the time of the incident was defective either in its design or because of a failure to warn; (2) that the helmet caused plaintiff's injuries, thereby undermining all

plaintiff's claims;[2] and (3) that defendant violated the CCPA. I examine each of these issues in turn.

### A.  STRICT PRODUCTS LIABILITY CLAIMS

Colorado has adopted the doctrine of strict products liability articulated in section 402A of the Restatement (Second) of Torts, which provides that

> [o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

**RESTATEMENT (SECOND) OF TORTS** § 402A(a)(1). ***See Hiigel v. General Motors Corp.***, 544 P.2d 983, 987 (Colo. 1975). A claimed defect may be premised on the design, ***Union Supply Co. v. Pust***, 583 P.2d 276, 280 (Colo. 1978), or manufacture of the product, ***see Fibreboard Corp. v. Fenton***, 845 P.2d 1168, 1173 (Colo. 1993), or on the basis of inadequate warnings, ***Hiigel***, 544 P.2d at 988.

Plaintiffs here presented no evidence to suggest a defect in the manufacture of the helmet. ***See Camacho v. Hondo Motor Co., Ltd.***, 741 P.2d 1240, 1247 (Colo. 1987) ("The question in manufacturing defect cases is whether the product as produced conformed with the manufacturer's specifications."); ***see also United States Aviation***

---

[2] Despite this argument, defendant did not move for judgment as a matter of law as to plaintiffs' claims for negligence or negligent misrepresentation in its oral Rule 50(a) motion made after the close of the plaintiff's case-in-chief. Accordingly, I may not consider any issues related to those claims. ***See Marshall***, 474 F.3d at 738.

***Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.***, 2006 WL 2844173 at *5 (D. Colo. Sept. 29, 2006) (noting that a manufacturing defect "may be as simple as a flaw in the manufacturing process such that a product comes off the line in nonconformity with manufacturing specifications, [and] also encompasses defects in the 'construction, installation, preparation, assembly, testing, or packaging' of a product") (quoting § 13–21–401(2), C.R.S.). I therefore consider only whether the evidence was sufficient to allow the jury to consider the questions of design defect and failure to warn.

### 1. DESIGN DEFECT

In considering a cause of action for design defect, a plaintiff may establish that the accused product reached the consumer in a "defective condition unreasonably dangerous to the consumer" under one of two tests: (1) the "consumer expectation test;" or (2) the risk-benefit test. ***Ortho Pharmaceutical Corp. v. Heath***, 722 P.2d 410, 413 (Colo. 1986), ***overruled on other grounds by Armentrout v. FMC Corp.***, 842 P.2d 175 (Colo. 1992). The query under the consumer expectation test is whether the produce was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." ***White v. Caterpillar, Inc.***, 867 P.2d 100, 104-05 (Colo. App. 1993) (citation and internal quotation marks omitted). The risk-benefit test is applicable "where the unreasonableness of the danger in the design defect and the efficacy of alternative designs in achieving a reasonable degree of safety must be defined by primarily technical, scientific information," ***Ortho Pharmaceutical***, 722 P.2d at 414, and "has been applied in cases involving products that are complex and largely

beyond the knowledge and experience of the ordinary consumer," *White*, 867 P.2d at 105 (citation and internal quotation marks omitted).

The jury in this case was advised of both theories (*see* **Jury Instruction No. 11**), but was not asked to consider the list of specific factors that inform the risk-benefit analysis. Arguably, this constitutes reversible error, although defendant has not argued as much.³ *See Ortho Pharmaceutical*, 722 P.2d at 415; *White*, 867 P.2d at 105-06. Nevertheless, I agree with defendant that the proper standard in this case is that provided by the risk-benefit test. Under that analysis, factors that may be considered include the following:

> (1) The usefulness and desirability of the product – its utility to the user and to the public as a whole.
>
> (2) The safety aspects of the product – the likelihood that it will cause injury and the probable seriousness of the injury.
>
> (3) The availability of the substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
>
> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

---

³ The court did instruct the jury on the affirmative defense contemplated by comment k of section 402A of the Restatement. (**Jury Instruction No. 37**.) *See Ortho Pharmaceutical*, 722 P.2d at 415 & n.4. It appears that this also constitutes reversible error. *See Wagner v. Case Corp.*, 33 F.3d 1253, 1256-57 (10th Cir. 1994).

*Armentrout*, 842 P.2d at 184 (quoting *Ortho Pharmaceutical*, 722 P.2d at 414 (internal citation and quotation marks omitted)).[4]  This list is neither exhaustive nor exclusive, but merely illustrative of considerations that may inform the analysis.  *Id.*  The burden is on plaintiffs to prove that the risks associated with the product outweigh the benefits of its design.  *Id.* at 185.

Plaintiffs failed to meet that burden here.  Indeed, such evidence of the relevant factors that was presented was all offered by defendant and supports the opposite inference – that the benefits of wearing the R.E.D. Hi Fi II helmet substantially outweighed any risks that might thought to be inherent to its design.  For example, it was undisputed not only that snowboarders are best served by wearing helmets but also that the helmet Mr. Melendy was wearing actually saved his life, which evidence goes to the first two *Ortho Pharmaceutical* factors.  Nothing presented at trial could be taken to suggest that helmets are not highly useful and generally efficacious at preventing many types of serious head injuries and deaths associated with participating in recreational snowsports.

Regarding the third and fourth factors, although plaintiffs' expert, Dr. Richard Stalnaker, testified that there were harder materials available for the shell and softer (or less dense) ones available for the liner, he offered no testimony suggesting what, if any, combination of these materials might have been used to create a helmet capable of preventing or mitigating the type of injury Mr. Melendy suffered.  Indeed, Dr. Stalnaker

---

[4] Plaintiffs point to no evidence relevant to the final factor articulated in *Ortho Pharmaceutical*, i.e., "the feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance."  *Ortho Pharmaceutical*, 722 P.2d at 414.

specifically acknowledged that he had not considered any specific alternative design at all. The only evidence presented on this point was that offered by defendant's expert, Dr. David Halstead, whose unrebutted testimony was that no such feasible alternatives existed:

> [Such a helmet would be] made out of depleted uranium and weighs more than [the wearer] can move. Therefore, he can't do anything while wearing the helmet. Therefore he won't be injured. . . .
>
> . . . [Y]ou could write a helmet standard that requires the helmet to cover from your shoulders to the top of your head and you look like Darth Vader and it weighs 6 pounds and no one would ever wear it. So you haven't accomplished anything when it comes to protecting the public because it's beyond the scope of what people are willing to wear.

(Tr. Vol. V at 49.)[5]

Regarding the fifth and sixth factors, plaintiffs present no argument or evidence to contradict the court's own recollection of the testimony presented at trial (none of which was transcribed or presented to the court for consideration here) that Mr. Melendy was an experienced snowboarder who was aware of the dangers inherent to the sport. Indeed, he manifested such awareness by signing a lengthy and detailed waiver prior to riding the Dark Territory Terrain Park, which waiver included the specific acknowledgment that he "underst[ood] that a helmet cannot guarantee [his] safety . . . [and] that no helmet can protect the wearer against all potential head injuries." (**Def. Motion App.**, Exh. I at 2.) In addition, and as explained more fully below, the hang tag

---

[5] In a less florid vein, Dr. Halstead opined that a helmet with four inches of padding – as opposed to the 1 to 1.5 inches typical of snowsport helmets – might have prevented Mr. Melendy's injuries, but that the mass and bulk of such a design likely would negatively impact other important aspects of the helmet's utility and performance, making it unlikely that anyone would purchase or wear a helmet thus designed.

8

affixed to the inside of Mr. Melendy's helmet gave similar warnings.

For these reasons, I find and conclude that there is insufficient evidence presented at trial to sustain plaintiffs' burden to prove that the risks inherent to the helmet outweighed its benefits. Defendant therefore is entitled to judgment as a matter of law as to this aspect of plaintiffs' strict products liability claim.

## 2. FAILURE TO WARN

Even when a product is not defective as to its design or manufacture, "a manufacturer or seller may be strictly liable to users of a product when the failure to provide adequate warnings renders the product defective and unreasonably dangerous." *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 199 (Colo. 1984); *see also Fibreboard Corp.*, 845 P.2d at 1173 n.10 ("In failure-to-warn cases it is the lack or insufficiency of a warning that makes a product both defective and unreasonably dangerous."). "The purpose of a warning is to ensure that an otherwise dangerous product is used in a reasonably safe manner." *Camacho*, 741 P.2d at 1248. The burden is on plaintiffs to prove that defendant gave inadequate warnings of the danger which proximately caused the injury. *Hiigel*, 544 P.2d at 63; *Peterson v. Parke Davis & Co.*, 705 P.2d 1001, 1004 (Colo. App. 1985).

The relevant issue in failure to warn cases is not whether the plaintiff was warned at all, but whether the warning was adequate to the specific danger the product allegedly presented. *See Anderson v. Heron Engineering Co.*, 604 P.2d 674, 677 (Colo. 1979). It thus matters greatly how the danger is characterized. Plaintiffs insist that defendant was required to specifically warn users that the certification standard to

9

which the subject helmet was tested – ASTM F2040 – was based on low-speed drop testing and thus offered limited protection. I disagree and find that the warning given was adequate and the helmet therefore not defective for failure to warn.

First, Dr. Halstead testified convincingly and without contradiction that ASTM F2040's internal recognition that it was "limited" was addressed to the scope of the standard and not to the protection it might offer wearers at speeds higher than those specifically referenced therein.[6] In fact, Dr. Halstead testified that this statement did not mean that the helmet offered no protection at speeds above the testing threshold of the standard – instead, the mechanics of the particular accident mattered greatly.[7] There was no evidence contradicting this explanation of what the standard meant in this regard.

Second, the helmet's hang tag *did* alert buyers that the helmet could not protect against every conceivable injury:

> Snowsports are real life. Natural and manmade obstacles are always present. While no helmet can guarantee your safety, use of a helmet, taking lessons, riding responsibility and within your abilities, and common sense can together reduce the risk of head injury. Wearing this helmet does not lessen the risk of a spinal injury. Remember – wearing a helmet does not make you invincible.

(**Def. Motion App.**, Exhibit I.) The warnings that "no helmet can guarantee your safety"

---

[6] Specifically, Dr. Halstead stated that this statement was intended to recognize that ASTM F2040 applied to recreational, as opposed to competitive, snowsport helmets. There was no evidence or argument presented at trial to suggest that a helmet certified for competitive snowsports would have prevented the injuries Mr. Melendy suffered.

[7] Indeed, Dr. Halstead testified that the force of the impact in this case was well below the threshold for which the helmet was certified, and that, had it not been for the violent rotational acceleration involved, Mr. Melendy most likely would have suffered no more than a mild concussion.

and that "wearing a helmet does not make you invincible" are actually more inclusive than the warning plaintiffs suggest was required. It is not clear to this court that knowing the exact speeds to which the helmet was certified would have made the product reasonably safer. *See Camacho*, 741 P.2d at 1248.

Finally, and most important, plaintiffs have failed to present sufficient evidence that the danger which allegedly caused Mr. Melendy's injury was related to the alleged limitations of the helmet. *See Hiigel*, 544 P.2d at 63. In particular, I find and conclude that the testimony of Dr. Stalnaker was not sufficient to support such an inference.[8]

The essence of Dr. Stalnaker's testimony was that the liner of the helmet should have been softer and the shell harder. Yet he was not able to quantify that opinion in any helpful, scientific way. He noted that other helmets used preferable materials, but he had not actually tested any such helmets. He stated that the helmet's liner had compressed "very little" from the impact, but he had not measured how much compression had actually occurred. Most importantly, he offered no opinion regarding how much softer or less dense the liner would have had to be in order to mitigate or prevent the injury Mr. Melendy suffered.[9]

---

[8] This conclusion is informed by the Tenth Circuit's decision in *Hoffman v. Ford Motor Co.*, 493 Fed. Appx. 962 (10th Cir. Aug. 16, 2012), *cert. denied*, 133 S.Ct. 2734 (2012) which was issued during the course of the trial of this case. The question addressed in *Hoffman* was whether the expert's laboratory tests sufficiently approximated real world events to allow him to offer a scientifically valid opinion as to the cause of the plaintiff's injuries. *See id.* at 973-78. Although I address a slightly different issue here, had the *Hoffman* opinion been issued prior to my consideration of defendant's Rule 702 motion – which was directed to this very aspect of Dr. Stalnaker's expert report – the resolution of that motion may well have been very different.

[9] Nor was his opinion sufficient to surmount defendant's state-of-the-art evidence. "In failure-to-warn cases, a product is not defective and unreasonably dangerous if a particular risk is not known or knowable in light of the generally recognized and prevailing scientific and technical knowledge available at the time of manufacture and distribution." *Fibreboard Corp.*, 845 P.2d at1175. Defendant is not required to be an insurer of its products. *Id.* The unrebutted testimony of Dr. Halstead was that the

In short, Dr. Stalnaker's opinion was not tethered to reliable, measurable, scientific guideposts that would have allowed a jury to conclude that a differently constructed helmet would have made a difference in the outcome in this case. An expert's bare *ipse dixit* does not provide sufficient evidence to support a jury's verdict. ***General Electric Co. v. Joiner***, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) ("[N]othing in either ***Daubert*** or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.").

There thus was insufficient evidence that the helmet could have been made safer or that Mr. Melendy's injury could have been avoided or mitigated by use of a differently constructed helmet. ***See Camacho***, 741 P.2d at 1248. Concomitantly, the evidence is insufficient to support a conclusion that the warning plaintiffs advocate would have made the helmet safer. ***See id.*** Accordingly, defendant is entitled to judgment as a matter of law on this claim as well.

### B. CAUSATION

Defendant maintains also that plaintiffs failed to establish that any alleged defect in the helmet actually caused Mr. Melendy's injuries. I have concluded already that there was insufficient evidence to sustain plaintiffs' strict products liability claims on other grounds. The only remaining claims properly preserved for my consideration of causation under Rule 50(b) are those for the alleged breach of implied warranties of

---

R.E.D. Hi Fi II helmet was one of the best on the market in terms of the level of protection it afforded. There can be no strict products liability for failure to warn of dangers that could not be foreseen or, if foreseeable, feasibly mitigated.

merchantability and of fitness for a particular purpose. (*See supra*, note 2.)

The warranty of merchantability implies that goods are "fit for the ordinary purposes for which such goods are used." §4-2-314(2)(c), C.R.S. By contrast, the warranty of fitness for a particular purpose implies a purpose other than the ordinary purpose for which the goods are used, "specific use by the buyer which is peculiar to the nature of his business." §4-2-315, comment 2. "[A] buyer obtaining goods for a 'particular purpose' is one who, for reasons peculiar to the buyer, is obtaining the goods for use other than that which is customarily made of the goods." *Elvig v. Nintendo of America, Inc.*, 2010 WL 3803814 at *4 (D. Colo. Sept. 23, 2010).

Causation is an essential element of both these claims. *See Truck Insurance Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1214 (10th Cir. 2004). Nevertheless, there is a disconnect between the type of causation necessary to sustain these causes of action and the arguments regarding causation which defendant advances in its Rule 50(b) motion. Causation in the context of these claims requires proof that the breach of the asserted implied warranty caused Mr. Melendy's injuries, damages, or losses. *See* **Colo. Jury Instructions – Civil 4th** 14:10 & 14:13. Defendant's arguments, by contrast, are directed to its contention that Dr. Stalnaker's testimony was insufficient to establish a scientific link between by Dr. Stalnaker's tests and the injuries Mr. Melendy actually sustained. To the extent Dr. Stalnaker's testimony was inadequate in this regard, defendant has not presented argument sufficient to allow me to conclude that such fact bears relevantly on the causation element of a breach of implied warranty claim.

Although defendant raised issues regarding the sufficiency of the evidence as to other elements of plaintiffs' breach of implied warranty claims in its Rule 50(a) motion, it has not reiterated them here.[10]  Moreover, and as noted above, defendant did not preserve any issue related to plaintiffs' negligence and negligent misrepresentation claims.[11]  **See Marshall**, 474 F.3d at 738.  I therefore am constrained to deny the motion to the extent it seeks judgment as a matter of law as to these claims.

### C. COLORADO CONSUMER PROTECTION ACT CLAIM

Finally, defendant moves for judgment as a matter of law as to plaintiffs' Colorado Consumer Protection Act ("CCPA") claim.  **See** §6-1-105(1)(e), C.R.S.  "The CCPA was enacted to regulate commercial activities and practices which, because of their nature, may prove injurious, offensive, or dangerous to the public."  ***Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.***, 62 P.3d 142, 146 (Colo. 2003) (citation and internal quotation marks omitted).  To prove a claim for relief under the CCPA, plaintiffs must establish:

> (1) that the defendant engaged in an unfair or deceptive trade practice;

---

[10] It is not clear to the court why these arguments were not brought forward post-trial. The court is dubious that the evidence was sufficient to establish (1) that defendant implicitly warranted that the helmet was suitable for a particular purpose (which was articulated at trial as that of "protecting snowboarders from serious head injuries while performing extreme tricks and jumps" (**see Jury Instruction No. 26**) – which the court further now doubts actually qualifies as a "particular purpose" under Colorado law; (2) if it were so warranted, whether the helmet was suitable for that purpose; or (3) that Mr. Melendy actually relied on defendant's skill or judgment to select the helmet for that purpose (**see Jury Instruction No. 27 ¶ 2**). Likewise, defendant's mid-trial attack on the merchantability element of the breach of implied warranty of merchantability claim appears to be one that would have had traction had it been renewed in the present motion. (**See Jury Instruction Nos. 29 & 30**.)

[11] Nevertheless, given that plaintiffs failed to offer sufficient evidence to sustain their strict products liability claims for design defect or failure to warn, it is questionable whether there remains any viable cause of action for negligence or negligent misrepresentation to be tried.

>    (2) that the challenged practice occurred in the course of
>    defendant's business, vocation, or occupation;
>
>    (3) that it significantly impacts the public as actual or
>    potential consumers of the defendant's goods, services, or
>    property;
>
>    (4) that the plaintiff suffered injury in fact to a legally
>    protected interest; and
>
>    (5) that the challenged practice caused the plaintiff's injury.

*Id.* at 146-47.

Plaintiffs base their CCPA claim on the allegedly deceptive nature of defendant's advertising, which shows Olympian Shaun White performing extreme aerial maneuvers while wearing the R.E.D. Hi Fi II helmet. ***See Garcia v. Medved Chevrolet, Inc.***, 263 P.3d 92, 98 (Colo. 2011) (CCPA claim may be premised on misleading advertising); ***Crowe v. Tull***, 126 P.3d 196, 210 (Colo. 2006) (same). This theory may be sustained where "reliance on the advertising was the first link in a chain of causation that led to" the plaintiff's injury. ***Crowe***, 126 P.2d at 210.

Assuming *arguendo* that the evidence was sufficient to sustain all other elements of this claim, it nevertheless is inadequate to prove that the allegedly deceptive trade practice significantly impacted the public as actual or potential consumers of the helmet. ***See Rhino Linings***, 62 P.3d 149 ("[I]f a wrong is private in nature, and does not affect the public, a claim is not actionable under the CCPA."). Considerations that inform this query include:

>    the number of consumers directly affected by the challenged
>    practice, the relative sophistication and bargaining power of
>    the consumers affected by the challenged practice, and
>    evidence that the challenged practice has previously

> impacted other consumers or has the significant potential to do so in the future.

***Martinez v. Lewis***, 969 P.2d 213, 222 (Colo. 1998).

Plaintiffs present nothing relevant to the second and third of these factors. Although they point to evidence that shows defendant projected sales between of 2009 and 2011 of between 50,000 to 75,000 helmets,[12] there was no evidence from which it could be concluded that any of these other buyers actually saw the allegedly deceptive advertisements, let alone that they relied on them in deciding to purchase the helmet.[13] It is not sufficient under the CCPA to show that the defendant's business or industry generally impacts the public; plaintiffs must adduce specific evidence showing that "the challenged *practice* . . . significantly impact[s] the public." ***Brodeur v. American Home Assurance Co.***, 169 P.3d 139, 155-56 (Colo. 2007) (emphasis in original). The nature and scope of [defendant's] business and its use of public forums do not automatically or presumptively create the necessary public impact." ***Id.*** at 156. Because plaintiffs' have failed to produce evidence that these advertisements significantly impacted the public, their CCPA claim cannot stand.

### IV.  CONCLUSION AND ORDERS

For these reasons, defendant is entitled to judgment as a matter of law as to

---

[12] these figures appear to cover markets throughout the world, not just in the United States, let alone Colorado specifically.  (***See* Plf. Resp. App.**, Exh. 10.).  Nor do plaintiffs point to any evidence suggesting that these figures represented a significant portion of the relevant consuming public during this time period.  Instead, plaintiffs cite to the deposition testimony of Hans A. Dyhrman attesting that in 2006, defendant had a ten percent share of the market for all (undifferentiated) ski and snowboard helmets in the United States.  Because this evidence does not address the number of sales the R.E.D. Hi Fi II helmet specifically, it is ultimately unilluminating on this point.

[13] Indeed, the evidence at trial strongly suggested that Mr. Melendy himself did not actually rely on the advertising in deciding to purchase the helmet.

plaintiffs' strict products liability and CCPA claims. The motion is denied with respect to the remaining four claims.

**THEREFORE, IT IS ORDERED** as follows:

1. That **Defendant The Burton Corporation's Motion for Judgment as a Matter of Law** [#173], filed January 10, 2013, is **GRANTED IN PART** and **DENIED IN PART** as follows:

> a. That the motion is **GRANTED** as to plaintiffs' strict product liability claims premised on design defect and failure to warn and as to plaintiffs' claim under the Colorado Consumer Protection Act; and
>
> b. That in all other respects, the motion is **DENIED**;

2. That plaintiffs' strict products liability and CCPA claims are **DISMISSED WITH PREJUDICE**;

3. That at the time judgment enters, judgment **SHALL ENTER** with prejudice on behalf of defendant, The Burton Corporation, against plaintiffs, the Trust Department of First National Bank of Santa Fe, Colorado Branch, and Richard Quanz as Co-Trustees and Representatives of the Irrevocable Trust of Stephen Melendy; and Stephen Melendy, on plaintiffs' strict products liability and CCPA claims; and

4. That on September 25, 2013, at 10:00 a.m. (MDT), the court **SHALL CONDUCT** a telephonic setting hearing conference to reset this matter for Trial Preparation Conference and trial; provided, that counsel for plaintiffs shall arrange, schedule, and coordinate the conference call necessary to facilitate the setting conference.

Dated September 11, 2013, at Denver, Colorado.

                                        **BY THE COURT:**

*/s/ Robert E. Blackburn*
Robert E. Blackburn
United States District Judge